## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

CHRISTOPHER SANDERS,

                Plaintiff,

v.                                                                Case No. 3:22-cv-668-BJD-PDB

C. TYRE, et al.,

                Defendants.

_____

## <u>ORDER</u>

### I. Status

Plaintiff, Christopher Sanders, a prisoner of the Florida penal system, is proceeding pro se on a Second Amended Complaint for Violation of Civil Rights (Doc. 26) against two medical Defendants and ten corrections Defendants based on conduct that occurred at Florida State Prison ("FSP") in 2021. Before the Court are the following motions: the medical Defendants' Motion for Summary Judgment (Doc. 162), with Plaintiff's Response (Docs. 168, 178) and Defendants' Reply (Doc. 180); the corrections Defendants' Motion for Summary Judgment (Doc. 165), with Plaintiff's Response (Doc. 174); and Plaintiff's Motion to Supplement Exhibits (Doc. 181), to which Defendants have not responded.

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

When the moving party has discharged its burden, the non-moving party must point to evidence in the record to demonstrate a genuine dispute of material fact. *Id.* Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing [the motion]." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citing *Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1578 (11th Cir. 1994)).

### III. Summary of Claims

Plaintiff's Complaint is confusing, rambling, and in some respects a shotgun pleading. *See generally* Doc. 26. As background, the Court concluded Plaintiff's initial complaint was a shotgun pleading and directed him to file an amended complaint. *See* Doc. 5 at 10. Specifically, the Court advised Plaintiff that he must set forth his claims plainly and not join multiple, unrelated claims. *See id.* at 12–13. Plaintiff's first amended complaint suffered from the same deficiencies as his initial complaint, so the Court directed him to amend again. *See* Doc. 13. Even after seeking and receiving clarification on how to cure the deficiencies, *see* Doc. 20 at 3–4, Plaintiff's Second Amended Complaint still joins unrelated claims and includes confusing, conclusory allegations, at

times making it unclear which claims he seeks to bring against which Defendants based on which conduct. *See generally* Doc. 26. Thus, for clarity of the record, the Court will summarize the basic facts and various claims Plaintiff purports to raise against each Defendant.

Plaintiff alleges the medical Defendants, Smith and Dahlman, were deliberately indifferent to his serious medical and mental health needs by ignoring him after he allegedly swallowed handfuls of pills. *Id.* at 8, 13, 21, 24. The first incident occurred on June 29, 2021, when Defendant Smith was counseling Plaintiff at his cell front before an organized use of force involving two corrections Defendants (Tyre and Willis). *Id.* at 8. The second incident occurred on October 14, 2021, when Defendant Dahlman was counseling Plaintiff at his cell front before an organized use of force involving other corrections Defendants (Aikin, Woods, Prock, and Reagor). *Id.* at 13.

As to the corrections Defendants, Plaintiff alleges the officers involved in the organized uses of force that followed the cell-front crisis interventions used excessive force against him (Defendants Willis and Tyre on June 29, 2021, and Defendants Aikin, Woods, Prock, and Reagor on October 14, 2021); the Warden and Assistant Warden (Defendants Davis and Bennett, respectively) allowed him to be housed on a wing with Defendant Tyre knowing that Tyre had been retaliating against him; Defendant Tyre took or destroyed his personal property, apparently in retaliation for having filed a lawsuit against

Tyre's wife, who also works at FSP; Defendants Aikin and Woods denied him

medical treatment or told the nurse not to document his injuries following the

October 14, 2021 incident; Defendants Prock and Tyre falsified documents to

have him placed on property restriction, which resulted in him "sleep[ing] on

a steel bunk in freezing cold cells"; and Defendant Prock seized and destroyed

his personal property.[1] *Id.* at 8–20. As relief, Plaintiff seeks compensatory and

punitive damages. *Id.* at 26–27.

Based on these incidents and allegations, Plaintiff sets forth the

following claims against each Defendant: (1) retaliation against Defendants

Tyre, Woods, Aikin, Mason, Prock, and Reagor, *id.* at 22; (2) cruel and unusual

punishment against Defendants Tyre, Willis, Aikin, and Mason for falsifying

records to justify spraying him with chemical agents, *id.*; (3) excessive force

against Defendant Reagor for "choking [him] until he was uncons[c]ious," *id.*;

(4) excessive force against Defendant Prock for slamming his head against his

metal bunk and sexually assaulting him by "grab[b]ing his penis," *id.*; (5)

excessive force against all Defendants involved in both use-of-force incidents

because the uses of force allegedly were unprovoked or unjustified and done

merely to "carry[] out the retaliation . . . on behalf of Defendant Tyre," *id.* at

---

[1] Plaintiff also lodges allegations against other FSP staff members who are not
named Defendants, including Officer T. Allen and Dr. Emanoilidis. *See* Doc. 26 at 21.

22–23;[2] (6) deprivation of personal property against Defendants Tyre and Prock, *id.* at 20, 23; (7) deliberate indifference against Defendants Smith, Dahlman, Woods, Aikin, and Mason for "not notifying anyone of the abuse" he suffered and for leaving him in his cell on the morning of June 29, 2021, after he swallowed pills, *id.*; (8) deliberate indifference and a violation of the Americans with Disabilities Act ("ADA") against Defendants Tyre, Willis, Aikin, Woods, Prock, and Reagor for using force against him knowing he "suffered from a mental disability," *id.* at 23–24; and (9) failure to protect against Defendants Davis and Bennett, *id.* at 24.

## IV. Medical Defendants' Motion

Plaintiff alleges Defendants Smith and Dahlman were deliberately indifferent to his serious medical and mental health needs. *See id.* at 23–24. These Defendants raise two arguments in their Motion for Summary Judgment: first, that the evidence contradicts Plaintiff's allegations against them; and second, that Plaintiff did not exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA"). *See* Doc. 162 at 2. To demonstrate Plaintiff cannot substantiate his allegations, Defendants Smith and Dahlman primarily rely on video evidence (Docs. 162-1, 162-3, 162-

---

[2] Plaintiff alleges in one section of his Complaint that Defendant Mason was involved in one or both use-of-force incidents. *See* Doc. 26 at 23. This appears to be a typo because Plaintiff does not mention Defendant Mason was personally involved in the force incidents when describing the facts. *See id.* at 8–10.

7), which was filed under seal (Doc. S-166).[3] They also provide use-of-force reports (Docs. 162-2, 162-6) and prison medical records (Docs. 162-4, 162-5, 162-8, 162-9, 162-10, 162-11, 162-12). They provide no grievance records.

## A. Exhaustion

Addressing the second issue first, Defendants argue Plaintiff has not demonstrated he exhausted his administrative remedies because he did not disclose any relevant grievances during discovery. *See* Doc. 162 at 14–16. As evidence, they provide Plaintiff's responses to requests for production of documents in which he said that he had no grievance records in his possession. *See* Doc. 162-13 at 1–2.

Exhaustion of available administrative remedies is "a precondition to an adjudication on the merits." *Bryant v. Rich*, 530 F.3d 1368, 1374 (11th Cir. 2008). Although "the PLRA exhaustion requirement is not jurisdictional[,]" *Woodford v. Ngo*, 548 U.S. 81, 101 (2006), "exhaustion is mandatory . . . and unexhausted claims cannot be brought," *Pavao v. Sims*, 679 F. App'x 819, 823

---

[3] Two DVDs were filed under seal, each containing videos from hand-held and fixed-wing cameras for the separate incidents. Video evidence will be cited by the sealed document number (Doc. S-166) followed by a parenthetical with the date of the incident, the type of camera ("HH" for hand-held and "FW" for fixed-wing), and either the start time in the case of the hand-held videos or the camera angle in the case of the fixed-wing videos (front or back).

(11th Cir. 2017)[4] (citing *Jones*, 549 U.S. at 211). However, prisoners need not affirmatively "demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Rather, because failure to exhaust is an affirmative defense, the defendant bears the burden. *Turner v. Burnside*, 541 F.3d 1077, 1082 (11th Cir. 2008).

Defendants offer no evidence to carry their burden on exhaustion, such as a declaration from a grievance coordinator or copies of grievance logs. Contrary to Defendants' suggestion, Plaintiff does not have the burden to demonstrate he exhausted his administrative remedies before initiating this action. As such, Defendants Smith and Dahlman's Motion is due to be denied as to this argument.

## B. Deliberate Indifference to Serious Medical Needs

Plaintiff alleges Defendants Smith and Dahlman, mental health counselors, were deliberately indifferent to his alleged suicide attempts ("swallow[ing] a handfull [sic] of pills")—Smith on June 29, 2021, before an organized use of force involving chemical agents, and Dahlman on October 14, 2021, before an organized use of force involving a cell extraction team. *See* Doc. 26 at 8–9, 13.

---

[4] Any unpublished decisions cited in this Order are deemed persuasive authority on the relevant point of law. *See McNamara v. GEICO*, 30 F.4th 1055, 1061 (11th Cir. 2022).

As an initial matter, the Court notes that Plaintiff does not allege how many pills he took on either occasion or what the pills were.[5] *See id.* at 8, 13. However, had he possessed a "handful" of pills and swallowed them in the presence of corrections staff, it is implausible that there would have been no official record of him having had "contraband," especially if the pills were prescription. Under the Florida Administrative Code ("FAC"), inmates are permitted to have a maximum of a week's dosage of over-the-counter medications in their cells. *See* Fla. Admin. Code r. 33-602.201. Any personal items "found in the possession of an inmate that are in excess of the established 'quantity' [are to] be treated as contraband." *Id.* The provision regarding contraband provides, "When medication is found in an inmate's possession that is beyond the labeled expiration date, or for which the inmate does not have a valid prescription, or is in quantities indicative of hoarding, the medication will be handled as contraband and turned over to the medical department for disposition." Fla. Admin. Code r. 33-602.203(6).

Defendants Smith and Dahlman do not address whether Plaintiff was disciplined for having had contraband in violation of the FAC, and it appears he was not. *See generally* Doc. 162. Rather, they argue the evidence—including video footage—contradicts Plaintiff's assertion that he swallowed pills in their

---

[5] Defendants explain that Plaintiff testified at his deposition that he took a prescription medication called Zyprexa, which is an antipsychotic. *See* Doc. 162 at 4.

presence. *See id.* at 11–13. According to them, they could not have been deliberately indifferent to Plaintiff's serious medical or mental health needs because they did not witness the complained-of conduct, if it happened at all. *Id.*

In the prison setting, "[t]he knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985). Additionally, the Eleventh Circuit has long recognized that a prison official's "deliberate indifference to an inmate's need for mental health care is actionable on [E]ighth [A]mendment grounds." *Greason v. Kemp*, 891 F.2d 829, 834 (11th Cir. 1990). *See also Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ("[A] prison inmate has the right under the Eighth Amendment to be free from deliberate indifference to serious physical or psychiatric needs.").

Regardless of whether a prisoner's deliberate indifference claim relates to medical or mental health care, he first must prove that he had an "objectively serious medical need," which the Eleventh Circuit defines as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Under this standard, a "serious medical need" is one that, "if left unattended,

poses a substantial risk of serious harm." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009).

Even if a plaintiff can demonstrate he had a serious medical need, "the deliberate-indifference standard sets an appropriately high bar." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020). A deliberate indifference claim requires a plaintiff to show the defendant acted with "subjective recklessness as used in the criminal law." *Wade v. McDade,* 106 F.4th 1251, 1255 (11th Cir. 2024) (en banc) (quoting in part *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)). Under the "subjective recklessness" standard, a prisoner-plaintiff "must show that the defendant official was subjectively aware that his own conduct—[] his own actions or inactions—put the plaintiff at substantial risk of serious harm." *Id.* at 1258, 1262. Establishing negligence is insufficient. *See, e.g.*, *Farmer*, 511 U.S. at 835 ("[Deliberate indifference describes a state of mind more blameworthy than negligence."); *Wilson v. Seiter*, 501 U.S. 294, 299 (1991) ("It is *obduracy and wantonness, not inadvertence or error in good faith,* that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause ...." (quoting (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986))).

### i.    Defendant Smith: June 29, 2021 Incident

Plaintiff asserts he took a handful of pills in Defendant Smith's presence, but Defendant Smith simply walked away, leaving him in his cell "for several hours." *See* Doc. 26 at 8–9; Doc. 168 at 2. He claims the video evidence shows

11

"Defendant Smith standing in front of [his] cell watching him overdose on medication [two] and a half hours before [he] was taken to medical and treated." *See* Doc. 168 at 2, 6; Doc. 178 at 1, 3.

Footage from a hand-held camera documents why a cell-front crisis intervention was warranted: on camera, Sergeant Willis (one of the corrections Defendants) reports that Plaintiff was causing a disturbance by yelling out of his cell at about 10:30 a.m., and Colonel Handley authorized the use of chemical agents "if necessary to bring [Plaintiff] into compliance." *See* Doc. S-166 (June 29, 2021, HH, 10:31 a.m.). The video shows Defendant Smith, accompanied by Defendant Willis and a second officer, walking to Plaintiff's cell to counsel him. Because Plaintiff is consulting with a mental health counselor, the camera operator stands a few cells away. *Id.* Thus, Plaintiff is not visible during the interaction; only the three staff members standing outside Plaintiff's cell can be seen. *Id.*

The crisis intervention lasts only twenty seconds, and Defendant Smith thereafter leaves the wing. *Id.* Defendant Willis remains, and because the mental health consultation has ended, the camera operator gets closer, so Plaintiff can be seen through the window of the cell. *Id.* Defendant Willis reports that Plaintiff would be given one final order to comply before chemical agents would be used. *Id.* Plaintiff appears to be in no distress as Defendant Willis speaks with him or during the two minutes in which Defendant Willis

leaves the view of the camera. *Id.* When Defendant Willis returns, Plaintiff apparently reports he will cease his disruptive behavior, so the recording is stopped. *Id.*

In his use-of-force report, Defendant Willis reported that Plaintiff "resumed his disruptive behavior" hours later, resulting in the authorized use of chemical agents at about 12:54 p.m. *See* Doc. 162-2 at 5–6.[6] According to Defendant Willis, "[Plaintiff] made several allegations that *following* the application of [chemical spray], he consumed a handful of unknown pills." *Id.* at 6 (emphasis added). That information was relayed to Nurse K. Burgin, who evaluated Plaintiff within thirty minutes of the use of force (after a decontamination shower). *See* Doc. 162-4 at 1. Nurse Burgin recorded that Plaintiff was alert and oriented to person, place, time, and situation, and responded verbally to questions. *Id.* His vital signs were stable, he had no visible injuries, and he walked steadily. *Id.*

Nurse Burgin also completed a form tilted "Poisoning/Overdose Protocol," because Plaintiff had reported taking an unknown number of pills "while on camera s/p [status post] use of force." *See* Doc. 162-5 at 2. Nurse Burgin placed Plaintiff on a cardiac monitor, monitored his vital signs, gave

---

[6] There is video footage of the use of force itself, but Defendant Smith was not present at that time, so it will not be summarized here. *See* Doc. S-166 (June 29, 2021, HH, 12:52 p.m.; June 29, 2021, FW front; June 29, 2021, FW back).

him "Activated Charcoal," notified an ARNP, and referred him to mental health. *Id.* at 3. *See also* Doc. 162-2 at 17; Doc. 162-4 at 1. Plaintiff was seen by mental health (possibly Defendant Dahlman) following the medical exam and then released to security. *See* Doc. 162-5 at 1, 5. *See also* Doc. 162-2 at 6, 10, 15.

Contrary to Plaintiff's contention, he did not swallow pills in view of the camera when Defendant Smith was conducting the crisis intervention. *See* Doc. S-166 (June 29, 2021, HH, 10:31 a.m.). When Defendant Smith was at Plaintiff's cell, Plaintiff was not visible because the camera operator had to keep his distance for privacy reasons. However, two officers were present at the time and able to see Plaintiff when he was speaking to Defendant Smith. *See id.* No officer reported that Plaintiff swallowed pills during the consultation with the mental health counselor. *See id.* Additionally, there is no mention in any reports of Plaintiff claiming to have swallowed pills during the cell-front crisis intervention with Defendant Smith.

All evidence, including video footage, suggests that if Plaintiff swallowed pills, he did so after the crisis intervention by Defendant Smith. First, Defendant Willis noted in his report that Plaintiff claimed to have swallowed pills *after* he was sprayed with chemical agents. *See* Doc. 163-1 at 6. Second, Plaintiff told Nurse Burgin that he "[took] pills while on camera [after a] use

14

of force." *See* Doc. 162-5 at 2. The use of force (chemical spray) occurred hours after Defendant Smith counseled Plaintiff.

Additionally, the hand-held camera footage from the afternoon, which shows the use of chemical agents and subsequent events, bolsters Plaintiff's claim that he swallowed pills after the use of force and on camera. According to the video, a few minutes after Plaintiff is sprayed with chemical agents, he raises his hand to his mouth and drops his head back as if swallowing something or pretending to swallow something. *See* Doc. S-166 (June 29, 2021, HH, 12:52 p.m.). It appears he is holding something white, such as a small cup, but it is unclear. He makes the gesture a few times. *Id.* The only officer who appears to be present is the camera operator. *Id.* It is undisputed Defendant Smith was not present. *Id.*

If Plaintiff indeed swallowed pills on June 29, 2021, as he alleges, the relevant evidence suggests he did so after Defendant Smith conducted the crisis intervention. Moreover, despite what the afternoon hand-held video shows (Plaintiff either swallowing something or pretending to swallow something), the medical records shed doubt on whether Plaintiff swallowed a handful of pills at any time. When Plaintiff was seen by medical, he was alert and stable. *See* Doc. 162-5 at 2. A charcoal treatment was administered based on Plaintiff's self-proclaimed conduct, not because the nurse objectively observed symptoms of overdose. *See id.* at 2–3. After both physical and mental

health evaluations, Plaintiff was released to security with normal vital signs and a steady gait. *Id.* at 5.

Upon review, there is no evidence that Plaintiff had a serious medical need of which Defendant Smith was aware. Had Plaintiff indeed swallowed some unknown number of pills, he did so after Defendant Smith counseled him and left the wing. And there is no evidence that Defendant Smith was apprised of Plaintiff's proclamation that he took pills after he was sprayed with chemical agents. Regardless, Plaintiff was taken for a medical evaluation within thirty minutes of the use of chemical agents where the nurse followed the protocol for possible poisoning or overdose and, after monitoring Plaintiff, cleared him from a medical standpoint. Additionally, a mental health counselor—which does not appear to have been Defendants Smith—cleared him from a mental health standpoint.

### ii.    Defendant Dahlman: October 14, 2021 Incident

Plaintiff's claim against Defendant Dahlman is nearly identical to the claim against Defendant Smith. Plaintiff alleges that, before the cell extraction team came to his cell on October 14, 2021, Defendant Dahlman conducted a cell-front crisis intervention at which time Plaintiff reported feeling suicidal and "then took a handful[] of pills." *See* Doc. 26 at 13. The cell extraction team thereafter removed Plaintiff from his cell and took him for a post-use-of-force examination. *Id.* at 14. In the emergency room, Plaintiff allegedly told

16

Defendant Dahlman officers had used excessive force in removing him from his cell, but Dahlman "knowingly and willfully refuse[d] to document [his] claims of staff abuse or notify anyone." *Id.* at 17.[7]

According to FDC reports, a use of force was deemed necessary because "[Plaintiff] was refusing all orders to submit to hand restraints for placement o[n] property restriction." *See* Doc. 162-6 at 1, 5. Defendant Dahlman conducted the crisis intervention beforehand, at about 11:16 a.m. *See id.* at 15; *see also*; Doc. 162-9 at 1. Like the consultation by Defendant Smith on June 29, 2021, the crisis intervention was recorded by hand-held camera, but the camera operator stood down the hall for privacy reasons. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.).

As seen on the hand-held video, Defendant Dahlman walks to Plaintiff's cell accompanied by one of the corrections Defendants (Aikin), where he remains for about fifteen seconds, and then he leaves the wing. *Id.* Plaintiff cannot be seen on the video during the consultation, but neither Defendant Dahlman nor Defendant Aikin reports that Plaintiff swallowed pills. *Id.* Immediately after Defendant Dahlman leaves, officers begin their efforts to remove Plaintiff from his cell. Those efforts will be summarized and addressed

---

[7] The Court previously dismissed Plaintiff's claim against Defendant Dahlman for his alleged failure to report abuse or injuries. *See* Doc. 101 at 5, 12.

later in this Order. For now, what is relevant are post-use-of-force events and statements.

At about 11:28 a.m., a nurse arrives to conduct a cell-front physical examination of Plaintiff. *Id.* The conversation cannot be heard, but at one point, Plaintiff bends down and yells out of the food slot that he swallowed pills. *Id.* Another Lieutenant tells Aikin, "[Plaintiff's] claiming he swallowed pills," and appears to direct Aikin to have Plaintiff removed from his cell for an examination in the medical room. *Id.* Plaintiff submits to restraints, and the members of the cell extraction team remove him from his cell at 11:33 a.m. *Id.* Plaintiff walks on his own to the medical room, where he arrives five minutes later, at 11:38 a.m.

The relevant medical records document that Plaintiff was ambulatory, alert, oriented to person, place, time, and situation, and responded verbally to questions. *See* Doc. 162-6 at 26; Doc. 162-8 at 1. He had minor injuries, including a laceration on his lower lip, which required stitches. *See* Doc. 162-6 at 26. It is unclear whether Plaintiff drank the recommended charcoal treatment to address his claim that he swallowed pills: According to a "Refusal of Health Care Services" form, Plaintiff refused the recommended charcoal treatment, *see* Doc. 162-10 at 1, but a MINS Incident Report notes "he drank charcoal without force," *see* Doc. 163-4 at 34. Plaintiff was thereafter assessed by mental health pursuant to the nurse's referral. *Id.* at 22, 26.

Dr. Emanoilidis, the Psychological Services Director at FSP, noted that crisis intervention techniques pre-use-of-force were successful, and Plaintiff was "not deemed to be at risk for serious self harm at [that] time." *See* Doc. 162-9 at 1. Dr. Emanoilidis further noted that Plaintiff was "angry after [the] use of force, making threats[, and] demanding to be transferred." *Id.* at 2. According to Dr. Emanoilidis, Plaintiff demonstrated a "low risk for suicidality" and a "possible medium risk for self-harm superficially to get transfer." *Id.* at 3. Dr. Emanoilidis cleared Plaintiff to be returned to security. *Id.* at 1, 3.

As with Plaintiff's claim against Defendant Smith, there is no evidence Plaintiff swallowed pills at any time—aside from his own proclamation that he had done so—or that, if he had swallowed pills, he did so in the presence of the mental health counselor. There is no indication from the video that Defendant Dahlman or the officer present for the cell-front crisis intervention (Defendant Aikin) saw Plaintiff swallow pills, nor is there any medical evidence that Plaintiff in fact swallowed a "handful" of pills such that he was at substantial risk of serious harm. Regardless, assuming Defendant Dahlman had witnessed Plaintiff swallow a handful of pills, Plaintiff was taken to the medical room immediately after officers were able to safely remove him from his cell. He was evaluated by a nurse and offered a charcoal treatment. Additionally, a mental health doctor (not Defendant Dahlman) evaluated Plaintiff and concluded he was not a suicide risk. No evidence substantiates that Plaintiff was at

substantial risk of serious harm, either physically or mentally or, if he was, that Defendant Dahlman knew as much.

### C. Conclusion as to Medical Defendants

The medical Defendants do not carry their burden on exhaustion. However, by reference to the record, including video footage, Defendants Smith and Dahlman demonstrate "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law" on Plaintiff's deliberate indifference claims. *See* Fed. R. Civ. P. 56(a). Drawing all reasonable inferences in Plaintiff's favor, there is no evidence in the record upon which a reasonable jury could return a verdict in Plaintiff's favor on his deliberate indifference claims against the medical Defendants. As such, the medical Defendants' Motion will be granted to the extent Plaintiff's deliberate indifference claims fail as a matter of law.

### V. Corrections Defendants' Motion

The corrections Defendants move for summary judgment on the ground that the evidence demonstrates no officer used excessive force during either organized use-of-force incident, and the supervisory officials (Warden Davis and Assistant Warden Bennett) did not fail to protect Plaintiff. *See* Doc. 165 at 11–12. To support their arguments, they rely on the same sealed video evidence as do Defendants Smith and Dahlman (Doc. S-166, Docs. 163-2, 163-5) and the same use-of-force reports, docketed separately (Docs. 163-1, 163-4). They also

provide the following: reports prepared by the Office of the Inspector General

("OIG") (Docs. 163-3, 163-6); sick-call requests Plaintiff submitted after the

first incident claiming to be on a hunger strike because of Defendant Tyre's

abuse (Docs. 163-7, 163-8, 163-9); and the affidavits of Defendants Bennett and

Davis (Docs. 163-10, 167-1).

### A. Claims Against Defendants not Involved in the Force Incidents: McGregor and Mason

Before addressing the separate force incidents, the Court will address

Defendants' argument that neither Defendant McGregor nor Defendant Mason

was directly involved in either incident. *See* Doc. 165 at 13, 16. First, Plaintiff

alleges that Defendant McGregor, the grievance coordinator, did not properly

process or respond to his grievance about the June 29, 2021 incident,

essentially "block[ing] [his] access to the grievance process." *See* Doc. 26 at 10;

Doc. 174 at 8. As the Court previously advised Plaintiff, *see* Doc. 5 at 13, such

an allegation is insufficient to sustain a claim because "an inmate has no

constitutionally-protected liberty interest in access to [a prison's] grievance

procedure." *Bingham v. Thomas*, 654 F.3d 1171, 1177 (11th Cir. 2011).

Additionally, "filing a grievance with a supervisory person does not

automatically make the supervisor liable for the allegedly unconstitutional

conduct brought to light by the grievance, even when the grievance is denied."

*Jones v. Eckloff*, No. 2:12-cv-375-Ftm-29DNF, 2013 WL 6231181, at *4 (M.D.

Fla. Dec. 2, 2013) (citing *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir.

2009)).

Next, Plaintiff appears to implicate Defendant Mason as having been

involved in one or both use-of-force incidents, *see* Doc. 26 at 23, but in

describing the facts, he does not mention Defendant Mason's direct

involvement, *see id.* at 9–10, 13–16. Moreover, the OIG and use-of-force reports

confirm that Defendant Mason was not directly involved in either incident. *See*

*generally* Docs. 163-1, 163-3, 163-4, 163-6. Thus, he could not have used

excessive force against Plaintiff.

### B. Claims Against Defendants Involved in the Force Incidents: Willis, Tyre, Aikin, Woods, Prock, and Reagor

The corrections Defendants argue the Supreme Court's *Whitley*[8] factors

demonstrate that the force used during each incident was reasonable under

the circumstances. *See* Doc. 165 at 18–23. They also argue Plaintiff's injuries

were only *de minimis. Id.* at 23–24. The Eighth Amendment "prohibits the

unnecessary and wanton infliction of pain, or the infliction of pain totally

without penological justification." *Ort v. White*, 813 F.2d 318, 321 (11th Cir.

1987). At the same time, it is well understood that prison guards, who are

charged with maintaining order and protecting inmates and staff, may use

---

[8] *Whitley*, 475 U.S. at 321 (identifying factors courts should consider when analyzing whether an officer used more force than necessary to quell a disturbance or regain control of a prisoner).

force when necessary. *Whitley*, 475 U.S. at 320–21; *Williams v. Burton*, 943 F.2d 1572, 1575 (11th Cir. 1991). Accordingly, courts must balance an inmate's right to be free from cruel and unusual punishment with a prison official's obligation to ensure a safe and secure institution. *Ort*, 813 F.2d at 321–22.

A prisoner against whom force is used to restore order demonstrates an Eighth Amendment violation "*only* if the measure taken 'inflicted unnecessary and wanton pain and suffering' caused by force used 'maliciously and sadistically for the very purpose of causing harm.'" *Williams*, 943 F.2d at 1575. Officers may use chemical agents to quell a disturbance so long as a valid penological reason supports its use and it is not used in "quantities greater than necessary or for the sole purpose of punishment or the infliction of pain." *Thomas v. Bryant*, 614 F.3d 1288, 1310 (11th Cir. 2010) ("[T]he use of chemical agents on recalcitrant prisoners is not per se unconstitutional." (quoting in part *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984))); *see also Sconiers v. Lockhart*, 946 F.3d 1256, 1264 (11th Cir. 2020) (acknowledging "pepper-spray" may be used to subdue an inmate when penologically necessary); *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 709–10 (11th Cir. 2010) ("Pepper spray is an accepted non-lethal means of controlling unruly inmates.").

Regardless of the type of force involved, whether an officer used more force than necessary to quell a disturbance or regain control of a prisoner

requires courts to consider various factors, including the need for force, the extent of force used in relation to the prisoner's conduct, the threat of harm the prisoner posed to others, whether the officer tried to "temper the severity of a forceful response," and the injuries inflicted. *See Williams*, 943 F.2d at 1575; *Whitley*, 475 U.S. at 321. *See also Skrtich v. Thornton*, 280 F.3d 1295, 1300 (11th Cir. 2002). A prisoner's lack of an injury is not dispositive but can be "evidence of the kind or degree of force that was used by [an] officer." *Charles v. Johnson*, 18 F.4th 686, 700 (11th Cir. 2021) (citing *Crocker v. Beatty*, 995 F.3d 1232, 1251 (11th Cir. 2021)).

In applying the *Whitley* factors, courts should "give a wide range of deference to prison officials acting to preserve discipline and security." *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007). Corrections officials are not required to "convince every inmate that their orders are reasonable and well-thought out," and "[c]ertainly . . . are not required to do so where an inmate repeatedly fails to follow those orders." *Danley*, 540 F.3d at 1307. As such, "courts must determine whether the evidence goes beyond a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives." *Whitley*, 475 U.S. at 322. A case should not go to the jury "[u]nless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain." *Id.*

24

###### i.    Defendants Willis and Tyre: June 29, 2021 Incident

The use of force on June 29, 2021, involved chemical agents. *See* Doc. 26
at 8–9; Doc. 163-1 at 1. Plaintiff alleges the use of force was excessive because
Defendants Willis and Tyre falsely accused him of "creating a disturbance" to
justify spraying him. *See* Doc. 26 at 7–9. He further alleges that Defendant
Tyre "grab[bed] his head . . . then tried to slam [him] to the floor" after Plaintiff
"spit in [Defendant Tyre's] face." *Id.* at 10.

The use-of-force reports written by those directly involved in the incident
are consistent in the explanation of events from Defendants' perspective. *See*
Doc. 163-1 at 1–8. In the morning, Plaintiff was yelling out of his cell and
"refus[ed] all orders to cease his disruptive behavior." *Id.* at 1. Defendant Tyre
"initially counseled" Plaintiff at about 9:50 a.m. *Id.* At about 10:13 a.m.,
Defendant Willis conducted a "risk assessment review" and obtained
authorization from Colonel Handley to use chemical agents if necessary, after
confirming with the nurse that Plaintiff "did not have any medical conditions
that would be exacerbated by the use of chemical agents." *Id.* at 1, 5. After the
cell-front crisis intervention by Defendant Smith, Defendant Willis gave
Plaintiff a final order to cease his behavior, and Plaintiff "temporarily
complied," but Defendant Willis told him "th[e] order would be effective for the
remainder of [his] shift and that if [Plaintiff] resumed his disruptive behavior,
chemical agents would be utilized." *Id.* at 5–6.

Plaintiff resumed his disruptive behavior at about 12:18 p.m., which Defendant Tyre reported to Defendant Willis. *Id.* at 6. As the shift supervisor, Defendant Willis reviewed video footage to confirm that Defendant Tyre "could be seen cell-front, ordering [Plaintiff] to cease his disruptive behavior," and then summoned other officers to Plaintiff's cell, including Officer Cecil Pittman (the camera operator) and Sergeant Christopher Knott (the officer who administered the chemical agents). *Id.* at 1, 6.

"[U]nder the direct supervision of [Defendant] Willis, [Sergeant Knott] administered three (3) one (1) second bursts of . . . chemical agents into [Plaintiff's] cell," which Plaintiff tried to block with his pillow and clothing. *Id.* at 1, 5–7. Plaintiff also slid the right side of his body (leg and arm) out of the cell, preventing officers from closing the door. *Id.* Eventually, Plaintiff complied with orders to "remove his leg and arm from the threshold of the door" and submitted to hand restraints. *Id.* Once outside his cell, Plaintiff "became argumentative and turned his head and spit on [Defendant] Tyre," which prompted "reactionary force."[9] *Id.* at 1, 6–7. Defendant Tyre and another officer tried to force Plaintiff to the wall, but Plaintiff resisted their efforts by pushing away from the wall. *Id.* at 1, 6, 8. Thus, officers forced Plaintiff to the floor, on his back. *Id.* Officers thereafter escorted Plaintiff to a decontamination shower

---

[9] Plaintiff incurred a disciplinary report for spitting. *See* Doc. 162-2 at 22.

and then to the medical room. *Id.* at 6. Plaintiff sustained no injuries from the incident. *Id.* at 6, 18–19.

A review of the fixed-wing and hand-held video footage shows events occurred precisely as described in the officers' reports. *See* Doc. S-166 (June 29, 2021). The hand-held camera footage shows the incident best. *See id.* (June 29, 2021, HH, 12:52 p.m.). That video shows Plaintiff blocking the effects of the chemical spray and wedging his body through the door so officers cannot close the cell door. *Id.* It also shows Plaintiff spitting on Defendant Tyre. *Id.* What is not captured by or reflected in the officers' reports is the noise: After Plaintiff spits on Defendant Tyre and is brought to the floor, other inmates can be heard banging loudly. *See id.* Additionally, during most of the walk to the decontamination shower, Plaintiff can be heard yelling at the officers. *See id.*

Upon review of the evidence and affording Defendants Tyre and Willis "a wide range of deference" in maintaining prison security, the Court concludes the *Whitley* factors balance in their favor as to the use of chemical agents. *See Cockrell*, 510 F.3d at 1311. First, there was a documented need to use force because Plaintiff was creating a disturbance and refused multiple orders to cease his behavior. The video footage does not capture Plaintiff yelling before chemical agents were utilized, but all reports indicate that Plaintiff had been causing a disturbance, and the behavior captured on camera demonstrates his proclivity for yelling, cursing, attempting to incite other inmates, and

27

physically resisting corrections officers' orders. *See* Doc. S-166 (June 29, 2021, HH, 12:52 p.m.). To the extent Plaintiff disavows having yelled out of his cell and claims Defendants Willis and Tyre made that up, a higher-ranking officer who is not a named Defendant, Colonel Handley, independently reviewed the request for authorization to use force and approved it. *See* Doc. 163-1 at 1, 20. Plaintiff's uncorroborated allegation alone is insufficient to overcome the deference afforded corrections officers in maintaining security inside a prison. *See Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) ("A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.").

Second, the force used was minimal, consisting of three bursts of chemical agents, most of which Plaintiff blocked. Third, Plaintiff presented a threat of harm through his disruptive conduct, which could have incited other inmates to behave similarly. Fourth, Defendants tried to temper the severity of a forceful response by giving Plaintiff numerous warnings, ordering a cell-front crisis intervention with the mental health counselor, and giving Plaintiff plenty of time to comply. Additionally, afterward, Plaintiff was allowed to wash the chemical agents off his body and was evaluated by medical. Finally, Plaintiff sustained no injuries.

The *Whitley* factors also balance in favor of Defendant Tyre with respect to Plaintiff's allegation that Defendant Tyre "grab[bed] his head . . . [and]

slam[med] [him] to the floor."[10] By Plaintiff's own concession, he had just spit
on Defendant Tyre. *See* Doc. 26 at 10; Doc. 174 at 3. Moreover, the video
evidence shows that Plaintiff was actively resisting officers' efforts to push him
against the wall him after he spit. *See* Doc. S-166 (June 29, 2021, HH, 12:52
p.m.). Thus, reactionary force was necessary. The video evidence also
contradicts Plaintiff's characterization of the incident as overly violent. *See id.*
Only minimal force was used to bring Plaintiff to the floor, even if that
consisted of "grab[bing]" his head and forcing him to the floor against his will.
*See Cockrell*, 510 F.3d at 1311 ("The amount of force conveyed by an open-
handed push or shove is as near to the minimum amount as an officer can
employ, and it is not disproportionate to the need to restore order when dealing
with a [disorderly] inmate."). Additionally, Plaintiff sustained no injuries, and
once he was subdued and a spit shield was placed on his head, no further force
was used.

With respect to both the use of chemical agents and Defendant Tyre's
reactionary force after Plaintiff spit on him, the Court concludes that "force
was applied in a good-faith effort to maintain or restore discipline, [not]
maliciously and sadistically to cause harm." *See Sconiers*, 946 F.3d at 1265.

---

[10] Plaintiff appears to abandon this portion of his claim in his Response. *See*
Doc. 174 at 3. He mentions only that he spit in Defendant Tyre's face "out of anger"
because Tyre told him he was throwing his property away. *Id.*

The corrections Defendants demonstrate there is no genuine issue of material fact for trial on Plaintiff's claim that Defendants Willis or Tyre (or any other Defendant) used excessive force against him on June 29, 2021.

ii.   **Defendants Aikin, Woods, Prock, and Reagor: October 14, 2021 Incident**

The October 14, 2021 use of force involved a cell extraction team. *See* Doc. 26 at 13; Doc. 163-4 at 1. Plaintiff claims the corrections Defendants involved (Aikin, Woods, Prock, and Reagor) used, or directed the use of, excessive force against him at different points throughout the interaction. *See* Doc. 26 at 13–14. According to use-of-force reports, Plaintiff had been placed on property restriction and was "refusing all orders to submit to hand restraints." *See* Doc. 163-4 at 1.[11] As with the June 29, 2021 incident, Plaintiff disavows having "done anything wrong" and suggests that Defendants Tyre and Aikin were merely "harassing" him for having filed lawsuits. *See* Doc. 26 at 13. His claims are based on events that allegedly occurred immediately after Defendant Dahlman conducted the cell-front crisis intervention at 11:16 a.m.

The hand-held video best shows the relevant events. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.). Before the cell-front crisis intervention, Defendant Aikin reports to the camera that Plaintiff was refusing to submit to hand

---

[11] Plaintiff was placed on property restriction because he had "misus[ed] his state issued property." *See* Doc. 163-4 at 38.

restraints to be placed on pre-approved property restriction. *Id.* Defendant Aikin notes that per the nurse, "chemical agents could not be utilized on [Plaintiff]," and a non-Defendant, Colonel Handley, had therefore authorized the use of a cell extraction team. *Id.* After Defendant Dahlman consults with Plaintiff and leaves, Defendant Aikin directs the members of the cell extraction team to introduce themselves. *Id.* The members of the team introduce themselves and state their responsibilities as follows: Sergeant Walin, responsible for the protective shield; Defendants Reagor and Prock, responsible for securing Plaintiff's upper extremities and applying hand restraints; and Sergeants Allen and Duncan, responsible for securing Plaintiff's lower extremities and applying leg irons.

After introducing themselves, the members of the cell extraction team prepare to enter Plaintiff's cell, but Plaintiff appears to say he will submit to hand restraints, so the team "stands down." *Id.* After being cuffed, Plaintiff exits his cell at 11:20 a.m. *Id.* He immediately falls to his knees and actively resists the officers' efforts to bring him to his feet. The cell extraction team members force Plaintiff to the floor face-first, apply leg irons, and hold him down while other officers remove the property from his cell. *Id.* Plaintiff can be heard yelling about being placed on property restriction, claiming he was being retaliated against for filing lawsuits. *Id.*

After the property removal is complete, Defendant Aikin orders the officers to execute a "four-man carry" to return Plaintiff to his cell because Plaintiff will not stand on his own. *Id.* Plaintiff actively resists their initial efforts, but the members of the cell extraction team eventually lift Plaintiff off the floor, return him to his bunk, and remove the leg irons. *Id.* The members of the cell extraction team slowly back out of the cell, and Defendant Tyre attempts to slide the door closed, but it gets stuck. *Id.* Before the door can be closed, officers suddenly react and start to struggle with Plaintiff again. *Id.* Because of the camera angle and the number of officers standing in the doorway, Plaintiff cannot be seen, so it is unclear what prompted the officers' reactions. *See id.*

Plaintiff claims that he "stumbled and fell." *See* Doc. 26 at 14; Doc. 174 at 4. On the other hand, Defendants and other non-Defendant officers explain in their use-of-force reports that Plaintiff "stood up [from his bunk] and charged Sergeant Duncan who was utilizing the protective shield." *See* Doc. 163-4 at 2, 6. Even though Plaintiff cannot be seen on the video at the relevant time, the video evidence directly contradicts Plaintiff's explanation that he stumbled and fell. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.). On the video, Plaintiff's right leg can be seen outside his cell as he struggles to push past the officers who are blocking the doorway. He is not lying on the floor. *Id.* With

32

some apparent difficulty subduing Plaintiff, officers safely exit the cell at 11:27 a.m. *Id.*

In his Complaint, Plaintiff does not appear to contest the use of the cell extraction team generally. Rather, he alleges discrete members of the team engaged in certain acts that violated his rights. However, in his Response to the corrections Defendants' Motion, Plaintiff suggests Defendant Aikin lied about him having had a "medical condition that prevented the use of chemical agents so [Aikin] could use the cell extraction team on [him]." *See* Doc. 174 at 4. He moves to supplement his Response with a copy of a medical record that he contends contradicts Defendant Aikin's statement. *See* Doc. 181 at 1.

Plaintiff's Motion will be granted, but the medical record he offers does not contradict Defendant Aikin's statement that chemical agents could not be used on him for medical reasons. *See* Doc. 181-1 at 1. A nurse made the following entry on October 14, 2021: "Review of chart for chemical agents – Problem list of asthma . . . Due to [a] risk of [a] negative outcome[, no][12] use of chemicals approved." *Id.* Not only does this record confirm that chemical agents were not approved for medical reasons, but the cell extraction team ultimately did not have to "extract" Plaintiff from his cell because he agreed to submit to restraints. Thus, the use of the cell extraction team did not amount

---

[12] The word "no" is expressed as an abbreviation: a circle with a slash through it.

to excessive force under the circumstances; Plaintiff's claim does not go "beyond a mere dispute over the reasonableness of a particular use of force." *See Whitley*, 475 U.S. at 322.

The only force the members of the cell extraction team used was reactionary to Plaintiff's combative behavior after he exited his cell. It is the reactionary force (or orders to use force) by Defendants that Plaintiff alleges violated his constitutional rights, as follows: Defendant Aikin told the cell extraction team members that Plaintiff had a weapon, knowing he did not, so they would use force against him; Defendant Aikin ordered the cell extraction team to "pick [him] up in the air and carry him back into [his] cell"; when Plaintiff was being held down outside the cell, one unidentified member of the cell extraction team "started grinding his elbow against Plaintiff's face and used unprovoked excessive force"; when the cell extraction team members returned Plaintiff to his cell the first time (using the "four-man carry"), Defendant Prock "slammed Plaintiff's face against the bunk and busted Plaintiff['s] lip open"; when the cell extraction team members returned Plaintiff to his cell the second time (after Plaintiff attempted to exit the cell), Defendant Prock "yank[ed]" on his penis, Defendant Woods told Defendant Reagor to "kill Plaintiff," and Defendant Reagor "choked [Plaintiff] until he

34

was unconscious," while yelling, "Die Die Die";[13] and Defendants Aikin and Woods refused him medical treatment after the incident. *See* Doc. 26 at 14–16.

First, accepting as true that Defendant Aikin lied about Plaintiff having had a weapon, Plaintiff does not have a constitutional right to be free from false accusations by a prison official. *See Wagner v. Smith*, No. 5:06-cv-11-MCR-EMT, 2006 WL 2482782, at *3 (N.D. Fla. Aug. 25, 2006) ("[T]he filing of false disciplinary charges against an inmate does not alone amount to a constitutional violation.").

Second, the use of the "four-man carry" does not constitute excessive force under the circumstances. Plaintiff concedes that he refused to stand or walk when he exited his cell before his property was removed, allegedly because he was afraid the officers "were going to slam him on his head." *See* Doc. 26 at 14; Doc. 174 at 4. The video documents his refusal to stand and his physical resistance to the members of the cell extraction team. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.). Regardless of the reason Plaintiff refused to stand or walk, he disobeyed a lawful order. Thus, officers were justified in using some force to return him to his cell, including "pick[ing] [him] up in the

---

[13] Plaintiff also generally alleges that three officers (Reagor, Prock, and Allen) "beat [him] and used excessive force while [he] was defenseless." *See* Doc. 26 at 15. It appears he is referencing the specific acts by Defendants Reagor and Prock, which the Court addresses.

air and carry[ing] him." *See* Doc. 26 at 14. The force used was minimal, and Plaintiff sustained minor injuries from being carried to his bunk—a cut lip.

According to FDC records, the officers who carried Plaintiff back to his bunk, including Defendants Reagor and Prock, "failed to conduct a proper four-man carry technique." *See* Doc. 162-6 at 3, 28. The officers were "counseled" and were to be "retrained . . . to ensure [the] proper technique [would be] utilized" in the future. *Id.* at 28. Defendants' violation of state law or FDC policies or procedures is not a constitutional violation actionable under 42 U.S.C. § 1983. *See Magluta v. Samples*, 375 F.3d 1269, 1279 n.7 (11th Cir. 2004) ("[T]he procedural requirements set out in [a state] regulation are not themselves constitutional mandates."). Thus, Defendants Prock and Reagor's violation of policy does not alone demonstrate they used excessive force.

Third, Plaintiff has never identified the officer who allegedly "started grinding his elbow against [his] face," and he does not address this allegation in his Response to Defendants' Motion or offer any evidence that it occurred. *See* Doc. 174 at 4. Moreover, no such action can be seen on the hand-held video. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.).

Fourth, it is undisputed that Defendant Woods did not use any force against Plaintiff on October 14, 2021. He was present and witnessed events but was not a member of the cell extraction team. *See id. See also* Doc. 163-4 at 2, 16. Plaintiff's allegation that Defendant Woods told Defendant Reagor to

"kill" him constitutes no more than "an unadorned, the-defendant-unlawfully-harmed-me accusation," which does not satisfy the federal pleading standard. *See Iqbal*, 556 U.S. at 678.

Fifth, Plaintiff's allegation that Defendants Aikin and Woods denied him medical treatment are unsubstantiated. It is clear from both the video evidence and medical records that Plaintiff received medical attention immediately following the incident. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.); Doc. 163-4 at 24, 26. Even if Defendants Aikin and Woods initially believed Plaintiff did not need to be removed from his cell for medical attention, a nurse came to his cell and determined he had to be taken to the medical room because he claimed to have swallowed pills. The officers followed the nurse's recommendation, and Plaintiff was taken to the medical room where he was evaluated and received stitches for his cut lip.

Finally, with respect to both Defendants Prock and Reagor, Plaintiff complains of conduct that allegedly occurred inside his cell, out of the view of the camera, yet he primarily relies on the hand-held video evidence to support his claims. *See* Doc. 174 at 5. He alleges Defendant Prock slammed his face into his metal bunk at the nine-minute-five-second mark on the video, and Defendant Reagor choked him until he was unconscious at the eleven-minute

mark on the video. *See id. See also* Doc. 26 at 14–15.[14] The events that were captured on the video demonstrate that reactionary force was justified—first when Plaintiff refused to stand or walk, and second, when Plaintiff "charged" at the officers when they were retreating from his cell and trying to close the door. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.).

Plaintiff contends that the sound of his head being slammed into the steel bunk "can [be] hear[d] . . . on the camera." *See* Doc. 174 at 5. This is not accurate. What can be heard at the nine-minute-five-second mark is Plaintiff being dropped onto his bunk by the five officers who were required to carry him back inside his cell because he refused to walk. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.). The sound of Plaintiff being dropped onto his bunk is not surprising, but the sound alone is not evidence that an officer intentionally slammed Plaintiff's face into the bunk to cause him pain.

Regardless of the inability to clearly discern what is happening inside Plaintiff's cell at the relevant time, to the extent Plaintiff banged his lip at some point (or had areas of his body poked, prodded, or pulled), such incidental injuries are to be expected when a cell extraction team is forced to subdue and move an inmate who is being combative and physically resistant. The use of a

---

[14] Plaintiff alleges in his Complaint that Defendant Prock also pulled on his penis, *see* Doc. 26 at 15, but he does not address that allegation in his Response to the corrections Defendants' Motion, *see generally* Doc. 174.

cell extraction team necessarily involves force. *See Thomas*, 614 F.3d at 1301 n.13 ("In a cell extraction, a team of five correctional officers enter an inmate's cell and *forcibly* restrain and []move him." (emphasis added)). A cut lip, bruises or contusions, and the pulling or tugging of body parts are "entirely consistent" with a reactionary use of force involving a cell extraction team. *See Charles*, 18 F.4th at 700 (noting that "small scrapes, bumps, and bruises . . . are entirely consistent with a routine takedown").

Plaintiff also contends the video shows the following at the eleven-minute mark: "[Defendant] Reagor sitting on top of [him] choking [him] while [Defendant] Woods ran out of the cell," and forty seconds later, "[Defendant] Reagor [having] to be pulled off [him] to stop the choking." *See* Doc. 174 at 5. Again, the video evidence does not show what Plaintiff claims it does. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.). In fact, because of the number of officers involved, Plaintiff cannot be seen at all at this point in the video, but he can be heard yelling. *See id.* Although choking an inmate to unconsciousness is not consistent with a reactionary use of force, the video evidence blatantly contradicts Plaintiff's assertion that he lost consciousness. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

As seen on the video, even before the members of the cell extraction team fully exit Plaintiff's cell (after he claims to have been choked to unconsciousness), Plaintiff sits up. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.). He is not unconscious. *See id.* Additionally, shortly after the cell door is closed, he can be seen standing at the window, and he later walks to the medical room with no apparent problem. *Id.* The medical records also belie that Plaintiff was choked. When he was evaluated shortly after being removed from his cell, Plaintiff was alert and oriented and in no distress, and the only visible injuries or marks were to his lip, arm, leg, and shoulder blade. *See* Doc. 163-4 at 24, 26. He had no marks on his neck. *See id.* There is no notation of Plaintiff having reported being choked or losing consciousness. *See id.*

Given the consistent description of the incident by Defendants and uninvolved corrections witnesses, the reliable video evidence showing the members of the cell extraction team using minimal force in response to Plaintiff's conduct, the medical records showing no injury to Plaintiff's neck, and the lack of corroborating evidence to support Plaintiff's claim that he was choked, the Court concludes this is the type of factual dispute envisioned by the Supreme Court as not being enough to proceed to a jury. *See Scott*, 550 U.S. at 380 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'").

On summary judgment, a plaintiff may not rely on the unsubstantiated allegations in his complaint. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves."). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). In light of the evidence presented by Defendants and Plaintiff's failure to provide any evidence other than his own uncorroborated claim that he was choked, no reasonable jury could find for Plaintiff. *See generally Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) ("[T]o defeat a motion for summary judgment, [the non-moving party] must adduce specific evidence from which a jury could reasonably find in his favor; '[t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient.'" (second and third alterations in original) (quoting *Anderson*, 477 U.S. at 252)).

Upon review of the evidence documenting the use-of-force incident on October 14, 2021, the Court concludes that "force was applied in a good-faith effort to maintain or restore discipline, [not] maliciously and sadistically to cause harm." *See Sconiers*, 946 F.3d at 1265. The corrections Defendants demonstrate there is no genuine issue of material fact for trial on Plaintiff's

claim that Defendants Aikin, Woods, Prock, or Reagor used excessive force against him on October 14, 2021.

### iii.    Failure-to-Protect Claims Against Warden Davis and Assistant Warden Bennett

Plaintiff's claim against the supervisory Defendants, Warden Davis and Assistant Warden Bennett, is vague and generally conclusory. He alleges Defendant Davis "did nothing to protect [him]" before the June 29, 2021 incident, which occurred the day after he told Defendant Davis that Defendant Tyre was harassing him because of the lawsuit he filed against Tyre's wife. *See* Doc. 26 at 6–7. He further alleges that between July and August, 2021, both Defendants Davis and Bennett told him "they were [going to] make sure [Defendant] Tyre would not be around [him]," but he was thereafter moved back to Defendant Tyre's wing, where he suffered more harassment, including the October 14, 2021 incident. *Id.* at 11–12. Finally, in his "Statement of Claim," Plaintiff alleges, "[D]efendants Davis and Bennett violated [his] [Eighth] Amendment rights by showing deliberate indifference to the threat to [his] life, and the . . . danger [he] was in." *Id.* at 24.

To the extent Plaintiff's claim against the supervisory Defendants is based solely on the officers' alleged use of excessive force, the claim necessarily fails because there was no underlying constitutional violation (i.e., excessive force). *See Mann*, 588 F.3d at 1308 (explaining that liability against a

supervisor for the acts of a subordinate depend on an underlying constitutional violation by the subordinate; if the underlying claim fails, the claim against the supervisor fails).

To the extent Plaintiff's claim is premised on Defendants Davis's or Bennett's failure to "protect" him from Defendant Tyre's harassment or retaliatory conduct, his claim fails. Plaintiff alleges having reported the alleged harassment to Defendant Davis only, not to both supervisory Defendants. *See* Doc. 26 at 6–7. However, assuming Plaintiff told both Defendants Davis and Bennett that Sergeant Tyre had harassed or wrongly disciplined him in retaliation for filing a lawsuit, that allegation alone is insufficient to support a deliberate indifference claim against these supervisory Defendants.

A prisoner must allege more than a "generalized awareness of risk" to proceed on a deliberate indifference claim. *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). *See also Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019). Plaintiff points to no evidence demonstrating that Defendants Davis or Bennett were "subjectively aware" that he was at "substantial risk of serious harm" but failed to respond "reasonably to the risk." *See Carter*, 352 F.3d at 1349. Supervisory officials at prisons likely hear daily complaints from inmates that corrections officers have mistreated them, have violated institutional rules, or have falsely accused them of bad behavior. Such

generalized complaints of harassment are insufficient to sustain a deliberate indifference claim.

Finally, to the extent Plaintiff's claim against Defendants Davis and Bennett is based on the mere fact that a subordinate employee allegedly violated his constitutional rights (other than by excessive force), his claim fails because liability under § 1983 may not be based on a theory of vicarious liability. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003), *abrogated in part on other grounds by Randall v. Scott*, 610 F.3d 701 (11th Cir. 2010). A claim against a supervisor may proceed only "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

It appears Plaintiff attempts to demonstrate the requisite causal connection between the supervisory Defendants' conduct and Defendant Tyre's alleged abuse by complaining that Defendants Davis and Bennett refused to move him off of Defendant Tyre's wing knowing that Tyre was harassing or abusing him. *See* Doc. 26 at 11, 13. Not only is this allegation insufficient given Plaintiff does not allege facts or point to evidence showing Defendants Davis or Bennett knew he was at substantial risk of serious harm, but Defendants aver through affidavits that they had no control over housing assignments. *See*

Doc. 163-10 ¶ 3; Doc. 167-1 ¶¶ 3–4. Plaintiff offers no evidence rebutting Defendants' affidavits. Thus, for the reasons stated, Defendants' Motion is due to be granted as to Defendants Davis and Bennett.

## C. Conclusion as to Corrections Defendants

The corrections Defendants demonstrate "there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law" on the following claims: interference with the grievance process against Defendant McGregor; excessive force (or deliberate indifference) against Defendants Mason, Willis, Tyre, Aikin, Woods, Prock, and Reagor; and failure to protect (or deliberate indifference) against Defendants Davis and Bennett. *See* Fed. R. Civ. P. 56(a). Drawing all reasonable inferences in Plaintiff's favor, there is no evidence in the record upon which a reasonable jury could return a verdict in Plaintiff's favor on these claims. As such, the corrections Defendants' Motion will be granted.

## VI. Remaining Claims Against Corrections Defendants

The corrections Defendants address only Plaintiff's core claims against them: those for excessive force, deliberate indifference, or a failure to protect. *See* Doc. 165 at 11–17. Specifically, aside from summarizing Plaintiff's allegations against each Defendant, the corrections Defendants do not address the following other purported claims: deliberate indifference against Defendants Mason, Aikin, Tyre, and Willis for ignoring him when he

swallowed pills on June 29, 2021; retaliation; falsification of records; property deprivation; an ADA violation; and cruel and unusual conditions of confinement.[15]

The Court will address the retaliation claims separately but first will invoke its authority to *sua sponte* dismiss claims that are clearly baseless or insufficiently alleged. *See* 28 U.S.C. §§ 1915(e)(2)(B), 1915A(b)(1) (providing that a district court must dismiss a complaint or any portion of a complaint filed by a prisoner if the court determines it is frivolous, malicious, or fails to state a claim on which relief may be granted). Since the PLRA's "failure-to-state-a-claim" language mirrors the language of Rule 12(b)(6) of the Federal Rules of Civil Procedure, courts apply the same standard in both contexts. *Mitchell v. Farcass*, 112 F.3d 1483, 1490 (11th Cir. 1997). *See also Alba v. Montford*, 517 F.3d 1249, 1252 (11th Cir. 2008).

## A. Deliberate Indifference

Plaintiff alleges Defendants Mason, Aikin, Tyre, and Willis, along with Defendant Smith, were deliberately indifferent to his serious medical needs by leaving him in his cell after he swallowed pills on June 29, 2021. *See* Doc. 26

---

[15] The Court appreciates that Plaintiff's Complaint is confusing, and his primary claims against the corrections Defendants appear to be excessive force and failure to protect. However, in the spirit of liberally construing Plaintiff's pro se Complaint and promoting judicial economy, the Court will address the other purported claims and allegations Plaintiff mentions.

at 8–9, 23. Unlike his claim against Defendant Smith, however, Plaintiff does not allege that Defendants Mason, Aikin, or Tyre saw him swallow pills. Thus, he does not plausibly allege Defendants Mason, Aikin, or Tyre knew he had a serious medical need. As such, this claim will be dismissed.

Plaintiff also alleges Defendants Aikin and Woods, along with Defendants Smith and Dahlman, did not report the abuse he allegedly suffered. *Id.* at 23. For the reasons articulated in the Order on Defendants Smith and Dahlman's Motion to Dismiss, these allegations are insufficient to state a plausible deliberate indifference claim, *see* Doc. 101 at 4–5, and the claim will be dismissed.

## B. Falsification of Records

Plaintiff alleges Defendants Tyre, Willis, Aikin, and Mason violated his rights under the Eighth Amendment by falsifying documents to have him sprayed with chemical agents. *See* Doc. 26 at 22. To the extent this allegation was intended to support Plaintiff's excessive force claim, it has been addressed in the context of that claim. To the extent this allegation was intended to support Plaintiff's retaliation claims against Defendants Tyre or Aikin, those claims will be addressed later in this Order.

To the extent Plaintiff intended to assert a stand-alone claim for the falsification of records, such a claim is not plausible under § 1983 because an inmate has no constitutional right not to be falsely accused of misconduct. *See*

47

*Asberry v. Anderson*, No. 1:22-cv-18-LAG-TQL, 2022 WL 22715124, at *2 (M.D.
Ga. May 19, 2022), *report and recommendation adopted,* 2023 WL 11195619
(Sept. 14, 2023) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986);
*Sprouse v. Babcock*, 870 F.2d 450, 452 (8th Cir. 1989)). Thus, any stand-alone
claim against Defendants Tyre, Willis, Aikin, or Mason for the falsification of
records will be dismissed.

### C. Property Deprivation & Cruel and Unusual Conditions of Confinement

In his "Statement of Claim," Plaintiff alleges Defendant Tyre violated his
rights under the Eighth and Fourteenth Amendments by "throwing [his]
property away"; in the section of his Complaint where he sets forth the factual
allegations, he claims Defendants Aikin and Woods subjected him to cruel and
unusual punishment by (1) forcing him to sleep on a steel bunk in a cold cell
with only boxers and (2) refusing to let him shower to wash away the blood on
his body (from his cut lip) or to change into clean boxers; and in the section of
his Complaint in which he identifies his "Injuries," he claims Defendant Prock
injured him by "unlawfully searching[,] seizing[,] and d[e]stroying [his]
personal property." *See* Doc. 26 at 17, 20, 23. *See also* Doc. 174 at 5.

It is unclear whether Plaintiff intended to state separate claims against
these Defendants based on these allegations, some of which he does not
incorporate into or mention in his identification of his claims. *See* Doc. 26 at

48

22–24. To the extent he did, his claims are not plausible. An intentional or
negligent deprivation of personal property does not constitute a Fourteenth
Amendment due process violation "if a meaningful postdeprivation remedy for
the loss is available." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). *See also
Daniels v. Williams*, 474 U.S. 327, 328 (1986). Florida's civil cause of action for
conversion provides an adequate postdeprivation remedy when law
enforcement officers seize or retain personal property. *See Case v. Eslinger*, 555
F.3d 1317, 1331 (11th Cir. 2009).

Additionally, an inmate does not state a plausible Eighth Amendment
claim for being placed on strip status temporarily. *See Woodson v. Whitehead*,
673 F. App'x 931, 932 (11th Cir. 2016) ("Confinement without clothing (other
than boxers), bedding, or hygienic materials for 72 hours during the months of
April and August in Florida is not the type of extreme prison condition[] that
create[s] a substantial risk of serious harm."). *See also O'Connor v. Kelley*, 644
F. App'x 928, 932 (11th Cir. 2016) (holding the prisoner failed to state the
conditions of his confinement were cruel and unusual when he was placed on
strip status for weeks).

Finally, conditions of confinement are sufficiently serious under the
Eighth Amendment only if they are so extreme that they expose the prisoner
to "an unreasonable risk of serious damage to his future health or safety."
*Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). Allegations of merely

harsh conditions do not state a claim under the Eighth Amendment. *Id.*
Accepting as true that Defendants Woods and Aikin did not allow him to clean
himself of his own blood or change his boxers, Plaintiff does not allege he was
exposed to "an unreasonable risk of serious damage to his future health or
safety." *See id.*

## D. ADA Claim

Plaintiff suggests Defendants Tyre, Willis, Aikin, Woods, Prock, and
Reagor violated his rights under the ADA by using "excessive force" against
him knowing he had a "mental disability." *See* Doc. 26 at 23. A claim of
discrimination under the ADA requires a plaintiff to establish "(1) that he is
a qualified individual with a disability; and (2) that he was either excluded
from participation in or denied the benefits of a public entity's services,
programs, or activities, or was otherwise discriminated against by the public
entity; and (3) that the exclusion, denial of benefit, or discrimination was by
reason of the plaintiff's disability." *Owens v. Sec'y, Fla. Dep't of Corr.*, 602 F.
App'x 475, 477 (11th Cir. 2015) (quoting *Bircoll v. Miami-Dade Cnty.*, 480
F.3d 1072, 1083 (11th Cir. 2007)).

Plaintiff's passing reference to the ADA is conclusory and unsupported
by any factual allegations permitting the reasonable inference he was
discriminated against because of a disability. Assuming Plaintiff had a
qualifying disability, he does not allege facts satisfying the other two elements

of an ADA claim. His contention that certain Defendants discriminated against him (by using or authorizing the use of force) because of his disability is conclusory and unelaborated. Thus, this claim will be dismissed.

### E. Retaliation

In his "Statement of Claim," Plaintiff asserts the following Defendants retaliated against him by "subjecting [him] to cruel and unusual punishment and attempted murder": Tyre, Woods, Aikin, Mason, Prock, and Reagor. *See* Doc. 26 at 22. To state an actionable claim for retaliation, a plaintiff must allege that he engaged in "constitutionally protected" speech, he "suffered adverse action" because of that speech, and there is a causal connection between the speech and the adverse action. *O'Bryant v. Finch*, 637 F.3d 1207, 1212 (11th Cir. 2011).

It appears Plaintiff alleges both use-of-force incidents were unjustified and happened only because two Defendants indicated they were seeking revenge for him having filed lawsuits. He alleges that on June 29, 2021, Defendant Tyre "lied saying [he] was causing a disturbance when he wasn't," and on October 14, 2021, Defendant Aikin ignored his plea that he had done nothing wrong, and Aikin responded that he "had been wanting to gas [Plaintiff] because of the lawsuit [Plaintiff] had filed on [Aikin]." *See* Doc. 26 at 9, 13.

Plaintiff does not allege any other Defendant was motivated to harm him because he had engaged in protected speech. Rather, he primarily describes an elaborate, months-long scheme by Defendant Tyre to "cause [him] physical pain and suffering and mental pain and suffering .... for filing a lawsuit against [Tyre's] wife," and he implies the other Defendants involved in both use-of-force incidents were merely following Defendant Tyre's orders. *Id.* at 22–23. For instance, he alleges, "The retaliation that was started on [June 28, 2021,] by Defendant Tyre and was carried out by Defendants Willis, Mason Aikin[], Woods, Prock, Reagor, and others led to Defendants attempting to kill [him] on [October 14, 2021,] by choking him . . . ." *Id.* at 19. *See also id.* at 22–23 (alleging other Defendants "carr[ied] out the retaliation of [him] on behalf of Defendant Tyre").

To the extent Plaintiff alleges Defendants Woods, Mason, Prock, and Reagor retaliated against him merely because they were involved in organized use-of-force incidents that Plaintiff speculates Defendant Tyre or Defendant Aikin orchestrated under false pretenses, Plaintiff fails to state a plausible claim against these Defendants. He does not allege any other Defendant knew about the lawsuits he had filed or gave Plaintiff any indication they were using force against him for exercising his First Amendment rights.

With respect to Defendants Tyre's and Aikin's alleged retaliatory motives in organizing separate force incidents, based simply on the allegations

52

in Plaintiff's Complaint, he states a plausible claim for relief, and Defendants do not move for summary judgment on this claim. Allowing these claims to proceed to trial as alleged, however, poses problems. First, it is entirely unclear whether Plaintiff intended to state a retaliation claim against Defendant Tyre for conduct other than Tyre's direct or indirect involvement in the use-of-force incidents or whether his claim is broader than that. For instance, in the section of his Complaint in which he sets forth his facts (also confusingly labeled "Statement of Claim"), Plaintiff alleges Defendant Tyre did other things to harm him allegedly in retaliation for filing a lawsuit against Tyre's wife, including the following: discarding or destroying his personal property on June 29, 2021; "block[ing]" him from attending a medical call-out, writing him a false disciplinary report, and refusing him lunch and dinner on September 15, 2021; threatening him and writing him another false disciplinary report on October 4, 2021; taking food off his trays between October 4, 2021, and October 18, 2021; and harassing him on October 14, 2021. *Id.* at 10–13. Plaintiff does not incorporate these allegations into his "Statement of Claim," in which he asserts that his retaliation claim against Defendant Tyre is based solely on the alleged physical abuse he suffered. *See id.* at 22.[16]

---

[16] He mentions some of the conduct when setting forth his other claims (i.e., deliberate indifference, falsification of records, and property destruction), as already addressed.

Additionally, to the extent Plaintiff's retaliation claims are premised on the alleged excessive force incidents, the evidence demonstrates the uses of force were justified, as already discussed at length, suggesting Plaintiff would be unable to prove there is a causal connection between the alleged retaliatory conduct and the protected speech. Significantly, as to the June incident, Defendant Tyre was not the officer who authorized the use of force—a non-Defendant, Colonel Handley, did so at Defendant Willis's request after Willis independently reviewed video footage showing Defendant Tyre "ordering [Plaintiff] to cease his disruptive behavior." *See* Doc. 163-1 at 1, 6, 20. As to the October incident, although Plaintiff alleges Defendant Aikin threatened to "gas" him, he was not in fact sprayed with chemical agents, and the cell extraction team ultimately was not used to "extract" him from his cell. The only force the cell extraction team members used was reactionary to his own combative behavior, as documented on video. *See* Doc. S-166 (Oct. 14, 2021, HH, 11:15 a.m.).

Given the above and having "identif[ied] for the parties material facts that may not be genuinely in dispute" on Plaintiff's retaliation claims against Defendants Tyre and Aikin, the Court invokes its authority under Rule 56(f)(3) to "consider summary judgment on its own." The Court will afford the parties an opportunity to submit memoranda on these claims. *See* Fed. R. Civ. P. 56(f). *See also Chapman v. Dunn*, 129 F.4th 1307, 1318 (11th Cir. 2025) ("[S]ummary

judgment should be granted *sua sponte* only in those circumstances in which the dismissed claims have been fully developed in the evidentiary record and the non-moving party has received adequate notice.").

## VII. Rulings

For the reasons stated, it is now

**ORDERED:**

1.    Defendants Smith and Dahlman's Motion for Summary Judgment (Doc. 162) is **GRANTED in part** to the extent they are entitled to summary judgment on Plaintiff's deliberate indifference claims.

2.    Defendants Davis, Prock, Mason, McGregor, Tyre, Aikin, Bennett, Reagor, Woods, and Willis's Motion for Summary Judgment (Doc. 165) is **GRANTED** to the extent they are entitled to summary judgment on the following claims:

> **a.** interference with the grievance process against Defendant McGregor;
>
> **b.** excessive force or deliberate indifference against Defendants Mason, Willis, Tyre, Aikin, Woods, Prock, and Reagor; and
>
> **c.** failure-to-protect or deliberate indifference against Defendants Davis and Bennett.

3.    The following claims are **dismissed without prejudice** under the PLRA:

**a.** deliberate indifference against Defendants Mason, Aikin, Tyre, Willis, and Woods;

**b.** falsification of records against Defendants Tyre, Willis, Aikin, and Mason;

**c.** property deprivation against Defendants Tyre and Prock;

**d.** cruel and unusual conditions of confinement against Defendants Aikin and Woods;

**e.** a violation of the ADA against Defendants Tyre, Willis, Aikin, Woods, Prock, and Reagor; and

**f.** retaliation against Defendants Woods, Mason, Prock, and Reagor.

4.    Plaintiff's Motion to Supplement Evidence (Doc. 181) is **GRANTED**.

5.    Within **thirty days** of the date of this Order, Defendants Tyre and Aikin must submit a summary judgment memorandum of no more than ten pages on Plaintiff's retaliation claims against them. If not already in the record, Defendants may provide supporting evidence. Within **thirty days** of Defendants' filing, Plaintiff must file a response of no more than ten pages with supporting evidence if any exists. In his response, Plaintiff may address only his retaliation claims against Defendants Tyre and Aikin as alleged in his Second Amended Complaint and as summarized in this Order. He may not raise new allegations or claims against Defendants Tyre or Aikin, nor may he address or seek to revive any other claim already disposed of through this Order.

6.    The **Clerk** is directed to terminate the following Defendants: Smith; Dahlman; Willis; Woods; Prock; Reagor; Mason; McGregor; Davis; and Bennett. Judgment in favor of these Defendants will be withheld pending final adjudication of the action as a whole. *See* Fed. R. Civ. P. 54.

**DONE AND ORDERED** at Jacksonville, Florida, this 14th day of May 2025.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:    Christopher Sanders
      Counsel of Record